UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MR. and MRS. A, o/b/o D.A.,

                          Plaintiffs,                          **MEMORANDUM
                                                               OPINION & ORDER**

          -against-
                                                               09 Civ. 5097 (PGG)

NEW YORK CITY DEPARTMENT OF
EDUCATION, and
JOEL KLEIN, in his official capacity as
Chancellor of the New York City School
District,

                          Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

          This case presents the following question of first impression:

    1.  When a child with disabilities has been denied a free and appropriate
        public education; and

    2.   the child's parents have enrolled the child in an appropriate private
        school; and

    3.  the equities favor an award of the costs of private school tuition; but

    4.  the parents, due to a lack of financial resources, have not made tuition
        payments but are legally obligated to do so;

does this Court's authority under Section 1415(i)(2)(C)(iii) of the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1415 (i)(2)(C)(iii), "to grant such

relief as the court determines is appropriate," include the power to order a school district

to make a retroactive tuition payment directly to the private school?  The New York City

Department of Education and its Chancellor, defendants herein, contend that IDEA grants

courts no such authority, arguing that the private school tuition remedy is available only

to parents with the financial means to pay – in the first instance – private school tuition

out-of-pocket.  This Court concludes that imposing such a limitation on this remedy is inconsistent with the statutory language and with Supreme Court jurisprudence interpreting IDEA, and would be entirely antithetical to Congress's clearly expressed legislative intent and purpose in enacting IDEA.

In this action, Plaintiffs seek funding under IDEA for their son D.A.'s tuition at the Rebecca School for the 2007-08 school year.  In state administrative proceedings, an impartial hearing officer ("IHO") found that (1) Defendants had failed to provide D.A., who has autism, with a free appropriate public education ("FAPE") for the 2007-08 school year; (2) the Rebecca School – where his parents unilaterally enrolled him – was an appropriate placement for D.A.; and (3) equitable considerations favor an award of tuition funding.  (IHO Dec. 23-27)  Consistent with the principles articulated by the Supreme Court in Sch. Comm. of the Town of Burlington v. Dep't of Educ., 471 U.S. 359 (1985) and its progeny, the IHO directed the New York City Department of Education ("DOE") to pay D.A.'s tuition balance for the 2007-08 school year, upon submission of appropriate documentation.  (IHO Dec. 27)

On DOE's appeal, a state review officer ("SRO") affirmed the IHO's determinations as to all three prongs of the Burlington test, but "annulled" the IHO's determination as to the tuition remedy, concluding that because the parents had not been able to pay D.A.'s tuition at the Rebecca School out-of-pocket, they "are not entitled to funding of the student's tuition."  (SRO Dec. 8)  Plaintiffs then filed this action seeking to overturn the SRO's determination.

The parties have cross-moved for summary judgment.[1]  Plaintiffs argue that this Court should overturn the SRO's determination that the private school tuition remedy is unavailable where parents have not paid the tuition out-of-pocket.  Defendants contend that the IHO and SRO erred in determining that Plaintiffs had satisfied all three elements of the Burlington test, but that the SRO's determination as to the unavailability of the private school tuition remedy should be upheld.  For the reasons stated below, Plaintiffs' motion for summary judgment (Docket No. 31) will be GRANTED and Defendants' motion for summary judgment (Docket No. 27) will be DENIED.

## I.    STATUTORY BACKGROUND

"Congress enacted the IDEA to promote the education of children with disabilities, 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs [and prepare them for further education, employment, and independent living, and] . . . to ensure that the rights of children with disabilities and parents of such children are protected.'"  Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) (quoting 20 U.S.C. § 1400(d)(1)(A), (B) and citing Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 367 (1985)).  "Under the IDEA, 'states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education."'"  R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d 283, 287 (S.D.N.Y. 2009) (quoting Gagliardo v.

---

[1]  In addition to extensive briefing from the parties, this Court has considered memoranda of law submitted amicus curiae by the New York Lawyers for the Public Interest, Partnership for Children's Rights, Advocates for Children of New York, Inc., New York Legal Assistance Group, Legal Services NYC-Bronx, Queens Legal Services, South Brooklyn Legal Services, and The Legal Aid Society.

Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA, 20 U.S.C. § 1400(d)(1)(A))).

A school district administers special education services through the development of an "individualized education program" ("IEP") for each child with disabilities.  20 U.S.C. § 1414(d).  In New York, local committees on special education ("CSE") are responsible for determining whether a child should be classified as eligible for educational services under IDEA and, if so, for developing an appropriate IEP for that child.  Walczak v. Florida Union Free School Dist., 142 F.3d 119, 123 (2d Cir. 1998) (citing Heldman v. Sobol, 962 F.2d 152 (2d Cir. 1992)).  "An IEP must state"

> (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

Id. at 122.

Parents who believe that their school district has failed to provide their child with a FAPE – due to an inadequate IEP or otherwise – may file a complaint with the state educational agency and request an impartial due process hearing before a hearing officer.  Id. (citing 20 U.S.C. § 1415(b)(1)(E); see also N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist., 473 F. Supp. 2d 532, 535 (S.D.N.Y. 2007), aff'd, 300 F. App'x 11 (2d Cir. 2008).  An IHO's decision may be appealed to an SRO, "after which any party still aggrieved may sue in either state or federal court."  Id. (citing 20 U.S.C. § 1415(e)(2)).

It is well settled that parents pursuing an administrative challenge "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111 (citing Burlington, 471 U.S. at 370). Such reimbursement covers "'expenses that [the school district] should have paid all along.'" T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting Burlington, 471 U.S. at 370-71). Courts considering a reimbursement request for the cost of private special education services must consider (1) whether "the school district [has] fail[ed] to provide a FAPE"; (2) whether "the private school placement is appropriate"; and (3) whether the "equities" warrant a reimbursement award in full or in part. Forest Grove School Dist. v. T.A., 129 S.Ct. 2484, 2496 (2009); see also Frank G., 459 F.3d at 363-64. Parents bear the burden of persuasion as to each element of a claim for reimbursement. Schaffer v. Weast, 546 U.S. 49 (2005).

Here, however, the parent-plaintiffs were unable to make more than a nominal payment towards the $84,900 annual tuition at the school in which they unilaterally enrolled D.A. Accordingly, Plaintiffs do not seek reimbursement of their out-of-pocket expenses, but rather retroactive direct payment to the Rebecca School for tuition associated with the 2007-08 school year.

## II.     ADMINISTRATIVE PROCEEDINGS

In a letter to DOE dated May 22, 2008, D.A.'s parents requested an impartial hearing. The parents contended that the CSE had failed to provide D.A. with a FAPE in that it had not issued "an appropriate IEP and a timely placement recommendation for the 2007-08 school year." (Parents Ex. A) Plaintiffs' counsel stated

that the parents sought "[f]unding for unilateral placement at the Rebecca School for the 2007-2008 school year." (Id.)

The impartial hearing commenced on September 18, 2008. (Transcript of Proceedings before Impartial Hearing Officer ("Tr.") at 4) Plaintiffs' counsel began the proceedings by stating that Plaintiffs sought "prospective funding" for D.A.'s placement at the Rebecca School. (Tr. 6) When asked whether Plaintiffs were seeking "any other remedy" in addition to "prospective payment of tuition," Plaintiffs' counsel said "No."[2] (Tr. 12)

### A.    The Evidence at the Impartial Hearing

During the 2007-08 school year, D.A. was a 14-year-old New York City resident suffering from, inter alia, autism, Asperger's Syndrome, bipolar disorder, and attention deficit hyperactivity disorder. (Def. R. 56.1 Stmt. ¶¶ 1-2; Pltf. R. 56.1 Counter-Stmt ¶¶ 1-2; Tr. 97; DOE Ex. 2 at 1) There is no dispute that D.A. is eligible for special education services. (SRO Dec. 1; Def. R. 56.1 Stmt. ¶ 4)

D.A. attended public school from kindergarten through third grade (Def. R. 56.1 Stmt. ¶ 5; Pltf. R. 56.1 Counter-Stmt. ¶ 5), and – pursuant to an IEP developed by a CSE – attended the Andrus-Orchard School, a private school approved by the New York State DOE, for grades four through six. (Tr. 319) For D.A.'s seventh grade year – 2006-07 – his parents enrolled him in the Rebecca School, a private school that has not been approved by the New York State DOE.[3] (SRO Dec. 2)

---

[2] As of September 18, 2008, when the impartial hearing began, Plaintiffs had paid at least $1000 to the Rebecca School for D.A.'s tuition. (Parents Ex. G)
[3] The record does not reveal all of the circumstances of D.A.'s enrollment at the Rebecca School for the 2006-07 school year. It appears that the parents were dissatisfied with the

## 1.      **Development of D.A.'s IEP for 2007-08**

On August 10, 2007, a CSE met to develop D.A.'s IEP for 2007-08, his eighth-grade year.  The CSE consisted of his parents, a DOE general education teacher, a DOE special education teacher, a DOE school psychologist and private school funding coordinator, a second DOE psychologist, a DOE social worker, D.A.'s Rebecca School special education teacher, D.A.'s Rebecca School social worker, and a parent member. (Def. R. 56.1 Stmt. ¶ 10; Pltf. R. 56.1 Counter-Stmt. ¶ 10; SRO Dec. 3)

In developing an IEP, the CSE considered, <u>inter alia</u>, an August 2007 evaluation by one of D.A.'s teachers at the Rebecca School, an Educational Update from May 2007 that included the Woodcock-Johnson test of achievement, and an updated "psycho-educational evaluation" from August 2, 2007.  (Def. R. 56.1 Stmt. ¶ 13; Pltf. R. 56.1 Counter-Stmt. ¶ 13)  The psycho-educational report states that D.A. "continues to demonstrate significant delays in his academic achievement."  He was performing at a third grade level in reading and at a second grade level in math, and had made "'negligible improvement'" over the past year.  (SRO Dec. 3 (quoting DOE Ex. 2))  The CSE discussed a number of problem areas for D.A., including the social use of language, comprehension of written materials, spelling, visual perceptual skills, the reading of social cues, working memory, and frustration management.  (Def. R. 56.1 Stmt. ¶ 24; Pltf. R. 56.1 Counter-Stmt. ¶ 24; Tr. 25)  The IEP developed by the CSE set goals for improvement in each of these areas, with objectives to be achieved by the middle of the 2007-08 school year and by the 2008 IEP meeting.  (DOE Ex. 1 at 21-35)

---

Andrus-Orchard School and unilaterally enrolled D.A. in the Rebecca School.  (Tr. 306-08)

In order to achieve the goals set forth in the IEP, the CSE recommended that D.A. be educated in a 12-month program at a non-public school.  (Def. R. 56.1 Stmt. ¶ 12; Pltf. R. 56.1 Counter-Stmt. ¶ 12)  The CSE also recommended a 6:1:1 student-to-teacher-to-paraprofessional ratio in D.A.'s classroom, two sessions of counseling per week, two sessions of occupational therapy per week, and two sessions of speech and language therapy per week.  (DOE Ex. 1 at 1; Def. R. 56.1 Stmt. ¶ 14; Pltf. R. 56.1 Counter-Stmt. ¶ 14)

### 2.    The CSE Defers Placement Decision to the CBST

The CSE discussed D.A.'s progress at the Rebecca School over the past year, and whether the Rebecca School should be his permanent placement.  The evidence on this point was mixed.  The Woodcock-Johnson standardized test indicated that, during his year at the Rebecca School, D.A. had improved by two grade levels in "word attack," 1.1 grade levels in spelling, and 0.8 grade levels in his letter-word identification.  (DOE Ex. 4 at 3)  However, the test also showed a 0.2 grade level decline in reading comprehension skills.  (DOE Ex. 4 at 3)  DOE school psychologist/private school funding coordinator Linda Lope, a member of the CSE, concluded that D.A. had made "minimal progress" during his year at the Rebecca School.  Lope conceded, however, that given the extremely low levels of achievement D.A. exhibited when he entered the Rebecca School – third percentile in reading and first percentile in math – D.A. made the level of progress that would be expected during his year at the Rebecca School.  (Tr. 27, 36)

Despite the approaching onset of the 2007-08 school year, the CSE reached no conclusion as to an appropriate placement for D.A.  Instead, "[t]he CSE

deferred the placement decision to the Central Based Support Team (CBST) to determine an appropriate placement for the 2007-08 school year." (SRO Dec. 4; <u>see also</u> DOE Ex. 1; Def. R. 56.1 Stmt. ¶ 29; Pltf. R. 56.1 Counter-Stmt. ¶ 29; Tr. 381) When a "CSE refers a case to [the CBST] for private school placement, it's because a child has special needs which require a high student/teacher class ratio, or a highly trained staff." (Tr. 371) The CBST approves funding for a student's private school tuition and forwards the student's file to potentially appropriate private schools. Each case referred to the CBST has a "case manager" who is charged with updating parents concerning the placement process and the search for a suitable school. (Tr. 366-67; IHO Dec. 21) D.A.'s parents testified, however, that they were never contacted by CBST personnel after the CSE meeting.[4] (Tr. 315-16, 183)

When a CSE has determined that a child is entitled to special education services but has not selected a specific placement, it generally "make[s] an interim placement prior to finding an appropriate private school." (Tr. 375) Here, however, the CSE "did not make an interim program recommendation" for D.A (Tr. 377; <u>see also</u> Tr. 377-78), because – according to Lope – "the parent was not going to accept it." (Tr. 376; <u>see also</u> Def. R. 56.1 Stmt. ¶¶ 30-31) Lope testified that no interim program placement was offered, because "it was quite clear to the team that the parent was placing the child back in the Rebecca School." (Tr. 375)

The parents deny Lope's account (Pltf. R. 56.1 Counter-Stmt. ¶¶ 30-31), noting that it is undisputed that no placement of any sort was offered to D.A. at the CSE meeting. <u>See</u> Tr. 376-78, 185-87, 313. Mrs. A testified that she pointed out to the CSE at

---

[4] Lope testified that she had seen a letter that the CBST sent to D.A.'s parents (Tr. 374, 367-68), but the letter was never introduced by DOE.

the meeting that it was then August 10, and asked "where are we putting him in September? . . . What am I going to do?"  According to Mrs. A, Lope replied that the parents should "put [D.A.] in Rebecca and fight for funding next year."[5]  (Tr. 313)  Mr. A likewise testified that his understanding, after the CSE meeting, was that "D.A. "should return to the Rebecca School until an . . . approved, non-public school could be found."  (Tr. 185)  The parents further testified that they delayed formally enrolling D.A. at the Rebecca School until several weeks into the school year, and that they had no desire to "take on the debt" of tuition at the Rebecca School if an appropriate non-public school placement was offered to D.A.  (Tr. 328)

After the CSE meeting, Lope contacted Frederica Blauston, the Executive Director of the Association for Metroarea Autistic Children (AMAC), to discuss the possibility of D.A. being placed at the AMAC school for the 2007-08 school year.[6]  (Def. R. 56.1 Stmt. ¶ 33; Pltf. R. 56.1 Counter-Stmt. ¶ 33)  Lope also faxed D.A.'s IEP to Blauston.  (Def. R. 56.1 Stmt. ¶ 36; Pltf. R. 56.1 Counter-Stmt. ¶ 36)  Blauston reviewed D.A.'s IEP, and concluded that he was an "appropriate candidate."  AMAC requires a personal interview of a child and his or her family before making an admission decision, however.  (Def. R. 56.1 Stmt. ¶ 39; Pltf. R. 56.1 Counter-Stmt. ¶ 39; Tr. 88)  Accordingly, Blauston twice called Mr. and Mrs. A. to schedule an intake interview,

---

[5]  Lope does not deny making this comment, but states that it was premised on her understanding that the parents "wanted to keep [D.A.] at Rebecca" for the 2007-08 school year.  (Tr. 371-72)

[6]  Mrs. A testified that Lope never discussed the AMAC school with D.A.'s parents, either at the CSE meeting or thereafter.  (Tr. 184, 312-14)  Lope gave conflicting testimony on this point.  She testified that there was no discussion of the AMAC school at the CSE meeting, and that the Committee had no school "in mind" (Tr. 46, 381), but she also testified that she mentioned the AMAC school to the parents and other Committee members at the CSE meeting.  (Tr. 45, 381)

leaving a message on each occasion.  Blauston further testified that the parents did not

return her calls. (Tr. 104, 107)  Mr. A. testified, however, that he twice returned AMAC's

calls, leaving a message on at least one occasion that he was calling about a possible

placement, but never succeeded in making contact with anyone at the AMAC school.

(Tr. 336, 188, 181-82)

       In addition to AMAC, the parents were contacted by two other private

schools.  D.A. and his father visited both schools, but neither offered D.A. a placement.

(Tr. 179-81)

### 3.      D.A. Is Enrolled at the Rebecca School for the 2007-08 School Year

       In a letter dated August 21, 2007, the parents advised the CSE that D.A.

would begin the 2007-08 school year at the Rebecca School, because "the CSE ha[d]

failed to provide an appropriate placement recommendation."  (Def. R. 56.1 Stmt. ¶ 63;

Pltf. R. 56.1 Counter-Stmt. ¶ 63)  In October 2007, the parents signed an enrollment

contract with that school.  (Def. R. 56.1 Stmt. ¶ 65; Pltf. R. 56.1 Counter-Stmt. ¶ 65; Tr.

16-20, 338; Parents Ex. H)

       D.A.'s Rebecca School tuition for the 2007-08 school year was $84,900.

(Def. R. 56.1 Stmt. ¶ 65; Pltf. R. 56.1 Counter-Stmt. ¶ 65)  Plaintiffs' annual income in

2007 was approximately $64,000.  (Tr. 185)  Plaintiffs signed the October 2007

enrollment contract with the hope that D.A.'s tuition would be funded pursuant to

Connors v. Mills, 34 F. Supp. 2d 795 (N.D.N.Y 1998).[7]  (Tr. 345)  At the request of the

---

[7]  As discussed below, in Connors v, Mills, the court stated, in dicta, that "once the
Burlington prerequisites relative to a non-approved public school are met, and a parent
shows that his or her financial circumstances eliminate the opportunity for unilateral

Rebecca School, Plaintiffs later entered into a monthly payment plan pending resolution of their request for public funding. (Tr. 344-45) Under that plan, the parents are paying off their tuition debt in monthly installments of $100. (Def. R. 56.1 Stmt. ¶ 67; Pltf. R. 56.1 Counter-Stmt. ¶ 67) As of the time of the impartial hearing, Plaintiffs had paid $1100 to the Rebecca School. (Def. R. 56.1 Stmt. ¶ 66; Pltf. R. 56.1 Counter-Stmt. ¶ 66) A Rebecca School representative testified at the hearing that if the parents failed to make their monthly payments, the School would take legal action against them. (Tr. 246)

### 4. D.A.'s Program and Progress at the Rebecca School

Several witnesses at the hearing addressed D.A.'s program and progress during his seventh and eighth grade years at the Rebecca School. Bonnie Waring, a social worker at the School, testified that she met with D.A. approximately twice a week during these years to work on his social and emotional problems. (Tr. 141) She noted that D.A.'s "social emotional functioning" had improved during this period, and that he had developed an ability to remove himself from stressful situations and calm himself. (Tr. 143) She also testified that he had improved his personal hygiene and developed more independence, learning to travel to school alone on the subway. (Tr. at 144-45, 151) Waring noted that when D.A. arrived at the Rebecca School, he was unable to remove himself from stressful situations and often became very aggressive. (Tr. 143) She said that his "biggest achievement" was in the area of building peer social relationships. (Tr. 146)

Tina McCourt, Program Director at the Rebecca School, addressed both D.A.'s emotional development and his academic program. The Rebecca School uses a

placement in the non-approved school, the public school must pay the cost of private placement immediately." 34 F. Supp. 2d at 805-06.

Developmental, Individual-Difference, Relationship-Based ("DIR") methodology.  (Tr. 196)  The School develops an individualized program for each child by evaluating the child along three axes:  development of intellectual and social skills, individual learning style and sensory capacities, and relationship building with peers and family.  (Tr. 200-02)  In order to facilitate D.A.'s progress in each of these areas, he met twice a week with a social worker, and received twice-weekly occupational therapy, weekly speech therapy, and "art therapy," in which he expressed ideas through art and learned to collaborate with other students on projects.  (Tr. 202, 208-09)

McCourt testified that the School also developed an individualized reading and math program for D.A.  (Tr. 208)  She explained that because D.A. is particularly interested in filmmaking, the School has "us[ed] that as one of the avenues to help him get ahead in . . . all the academics."  (Tr. 207)  For example, D.A. and his classmates produced a short movie on the American Revolution.  (Tr. 212)  D.A. began the 2007-08 school year in a classroom with seven other students, one teacher and three teaching assistants; in January, his class size was reduced to four students taught by one teacher and two para-professionals.  (Tr. 212)

McCourt stated that when D.A. arrived at the Rebecca School, he was emotionally shut down and prone to anger.  (Tr. 205)  She explained that "the only range of emotion that he would have is sort of baseline and then very angry."  (Tr. 205)  She shares Waring's view that D.A. made "huge" gains during his time at the school.  (Tr. 205)  D.A.'s aggressive outbursts stopped and his ability to discuss his feelings – rather than simply "shut down" – significantly improved.  (Tr. 207)  McCourt also noticed

improvements in D.A.'s personal hygiene and in exercising independence, including unaccompanied use of the subway.  (Tr. 207)

Ms. A testified that D.A. had made tremendous progress at the Rebecca School, both academically and emotionally.  She testified that D.A. could now carry on a conversation, read and do research, cook for himself, navigate the internet, and take public transportation unsupervised.  (Tr. 321-22)

### B.     Impartial Hearing Officer's Determination

The IHO, in a December 1, 2008 decision, ruled that the parents were entitled to "prospective funding for the Rebecca School tuition balance for the 2007/2008 school year."[8]  (IHO Dec. 27).

The IHO found that the "CSE team was properly comprised and procedurally proper" (id. at 23), and that "the IEP was reasonably calculated to enable the student to receive an educational benefit."  (Id. at 24)  The IHO concluded, however, the school district had failed to offer a FAPE to D.A., because it never provided him with either an interim or permanent placement:

> [T]he main issue raised in this record is whether the district provided a timely and appropriate placement for the student. . . . I find that a mere referral to the CBST does not constitute a placement. . . . [T]he record contains no evidence that an offer of placement or written recommendation for placement at AMAC was ever extended to the parent. The record lacks any evidence of a formal offer of placement for the student subsequent to the review held on August 10, 2007.  Additionally, the school district failed to develop an interim placement for the student. Accordingly, the Board failed to establish prong one of the Burlington/Carter court mandate, thereby establishing that it failed to offer this child a FAPE for the 2007-2008 school year.

(IHO Dec. 24)

---

[8]  The IHO granted no reimbursement remedy to Plaintiffs, who had sought none.  See p. 6, supra, and p. 18 n.9, infra.

As to <u>Burlington</u>'s second prong – the appropriateness of the private school placement – the IHO noted that "the school district offered no witnesses or documentary evidence which support[s its] position" that the Rebecca school was not appropriate.  (IHO Dec. 25)  Citing the evidence that D.A. had made "substantial progress" both academically and socially at the Rebecca School, the IHO found that the School's program was "aligned with the child's sensory processing, attentional, behavioral, academic, language and communication, social, and motor needs . . . and has provided the student with educational benefits."  (<u>Id</u>.).  The IHO concluded that "the parent's choice of the Rebecca School for their child's daily education is entirely proper." (<u>Id</u>. at 25-26)

As to <u>Burlington</u>'s third prong – equitable considerations – the IHO stated that "[t]he record is clear that the parents cooperated in good faith at all times with the DOE."  In light of the district's "fail[ure] to implement a FAPE by offering this child an appropriate and timely placement," and "with time running out for obtaining a program and placement for their child, the parents acted reasonably in re-enrolling their child at the Rebecca School."  (<u>Id</u>. at 26-27)  Noting that the parents had "notified the school district of such placement by letter dated August 21, 2007," the IHO found "that equity supports the parents' claims under prong three."  (<u>Id</u>. at 27)

Having concluded that the parents had satisfied all three prongs of the <u>Burlington</u> test, the IHO then considered their request for "prospective funding of tuition," given their contract with the Rebecca School and "financial[ inability] to fully pay the tuition."  (<u>Id</u>.)  Citing <u>Connors</u>, and noting the district's "fail[ure] to provide an appropriate placement recommendation" and consequent denial of a FAPE, the IHO

concluded that "[u]nder the circumstances of this case, an order for a district to pay tuition costs is appropriate as an equitable remedy."  Accordingly, the IHO ordered that the "DOE shall provide prospective funding for the Rebecca School tuition balance for the 2007-2008 school year."  (Id.)

> **C.**     **State Review Officer's Determination**

The DOE appealed, and in a March 2, 2009 decision, the SRO affirmed the IHO's findings as to each of the three Burlington prongs but "annulled" the IHO's tuition payment remedy.

After carefully reviewing the evidence, the SRO expressed "agree[ment] with the impartial hearing officer's finding that the district failed to offer the student a FAPE because it failed to make any formal placement offer for the student."  (SRO Dec. 7)  The SRO also agreed that the Rebecca School was an appropriate placement, finding that the hearing record demonstrated both "that the Rebecca School addressed the student's social/emotional, communication, sensory, motor, and academic needs through small classes, specially designed instruction, and through the provision of related services," and "that the student benefited from this instruction and these related services." (Id.)  Finally, the SRO agreed that the record demonstrated that "the parents cooperated with the district, participated at the CSE meeting, visited proposed placements, and notified the district in writing that they were re-enrolling the student at the Rebecca School when no placement was offered by the district."  (Id.)

Having concluded that the parents had satisfied all three prongs of the Burlington test, the SRO went on to consider the prospective tuition remedy ordered by the IHO.  Noting that IDEA provides that "'a court or a hearing officer may require the

[school district] to <u>reimburse</u> the parents for the cost of [private school] enrollment if the court or hearing officer finds that the [school district] had not made a [FAPE] available to the child in a timely manner prior to that enrollment'" (SRO Dec. 8 (quoting 20 U.S.C. § 1412(a)(10)(C)(ii)) (emphasis in SRO decision), the SRO noted that "IDEA does not expressly provide for payment of tuition costs in the circumstances herein."  (<u>Id</u>.)  The SRO went on to hold that where parents are not seeking reimbursement for out-of-pocket expenses, but are instead seeking a direct payment of private school tuition, they have no remedy under IDEA:  "where the parents are not requesting reimbursement for out-of-pocket costs or direct payment for compensatory education services, . . . [they]  are not entitled to funding of the student's tuition."  (<u>Id</u>.)  The SRO then ordered that the IHO's decision "is annulled insofar as it awarded the parents funding for the student's tuition costs at the Rebecca School for the 2007-08 school year."  (<u>Id</u>.)

## DISCUSSION

### I.   THE IHO AND SRO PROPERLY DETERMINED THAT PLAINTIFFS HAD SATISFIED ALL THREE PRONGS OF THE BURLINGTON TEST

#### A.   <u>Introduction</u>

Defendants argue that the SRO's decision denying Plaintiffs funding of D.A.'s tuition costs at the Rebecca School should be affirmed because (1) Plaintiffs did not satisfy the three elements of the <u>Burlington</u> test; and (2) under IDEA, "parents cannot seek prospective, or direct, tuition funding (as opposed to tuition reimbursement) for tuition payments they have not actually paid."  (Def. Br. 1-2)  Before analyzing the evidence pertinent to <u>Burlington</u>'s three-prong test, this Court must consider two preliminary issues:  (1) whether the <u>Burlington</u> test applies to a case in which Plaintiffs

are seeking retroactive direct funding of private school tuition,[9] as opposed to reimbursement for out-of-pocket tuition expenses[10]; and (2) whether Defendants have waived their right to challenge the SRO's determination that Plaintiffs satisfied the Burlington test.

        The parties, the IHO, and the SRO have all assumed that Burlington's three-part test governs Plaintiffs' request for retroactive direct payment of private school tuition.  (Pltf. Br. 1-5; Def. Br. 4; IHO Dec. 24-27; SRO Dec. 6-7)  No case has squarely held, however, that IDEA authorizes retroactive direct payment of private school tuition where a school district has not provided a FAPE to a child entitled to special education services.  Accordingly, it is worth considering whether the same test applicable to a reimbursement request applies to a request for retroactive direct tuition payment relief.

---

[9]  While the parties refer to the Plaintiffs' application as one seeking "prospective" relief, it appears to this Court that Plaintiffs are seeking a retroactive remedy – they request an order requiring the school district to pay tuition that originally became due in 2007.

[10]  Although the Complaint seeks a judgment that Plaintiffs are entitled to the $1100 already paid to the Rebecca School – as well as "any subsequent payments" (Cmplt., Prayer for Relief) – the SRO correctly ruled that Plaintiffs had not sought reimbursement for out-of-pocket expenses.  (SRO Dec. 8)  Having not made that claim during the administrative proceedings, they cannot make it now.

        Plaintiffs' letter requesting an impartial hearing is ambiguous on this point, stating merely that Plaintiffs seek "[f]unding for unilateral placement at the Rebecca School for the 2007-2008 school year."  (DOE Ex. A)  At the outset of the hearing, however, and in response to a query from the hearing officer, Plaintiffs' counsel stated that Plaintiffs sought only "prospective funding" for D.A.'s placement at the Rebecca School.  (Tr. 6) When asked whether Plaintiffs were seeking "any other remedy" in addition to "prospective payment of tuition," Plaintiffs' counsel said "No."  (Tr. 12)  Accordingly, the IHO and SRO properly concluded that Plaintiffs were seeking only "prospective funding" of tuition and not "reimbursement for out-of-pocket costs" (IHO Dec. 27; SRO Dec. 8), and Plaintiffs may not raise a reimbursement claim before this Court.  See A.D. v. Bd. of Educ. of City Sch. Dist. of New York, 690 F. Supp. 2d 193, 215-16 (S.D.N.Y. 2010) (declining to consider plaintiffs' claim for reimbursement of summer-school expenses where parents had not "file[d] a due process complaint . . . and pursue[d] the administrative review process" as to that claim).

In Burlington, the Court noted that an award of prospective relief was authorized by then Section 1415(e)(2) of IDEA, and that a request for such relief would be subject to the same analysis applicable to a reimbursement request:

> In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that "appropriate" relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school.

Burlington, 471 U.S. at 370.  Moreover, in S.W. v. New York City Dept. of Educ., 646 F. Supp. 2d 346 (S.D.N.Y. 2009), a court considering a claim for a "retroactive direct tuition payment" concluded that "the Burlington analysis would apply" to such a claim. S.W., 646 F. Supp. 2d at 360 n.3.  In light of the language in Burlington indicating that the three-part test is applicable to requests for prospective relief and retroactive reimbursement, and the S.W. court's conclusion that the same three-part test applies to claims for a retroactive direct tuition payment, this Court will apply Burlington's three-part test here.

As to waiver, Plaintiffs contend that Defendants may not now challenge the SRO's finding that Plaintiffs satisfied all three prongs of the Burlington test, because they did not "plead the relief they seek as a counterclaim."  (Pltf. Rply. Br. 7; see also Pltf. Sum. J. Br. 2 n.2; Pltf. Opp. Br. 12-13)  Plaintiffs contend that Defendants were required under Fed. R. Civ. P. 13 to plead, as a counterclaim, their assertion that Plaintiffs did not satisfy any of the Burlington elements.

Defendants argue, however, that they were not required to plead a counterclaim, because they seek no relief against the Plaintiffs, but rather affirmance of

the SRO's decision denying relief to Plaintiffs.[11]   (Def. Opp. Br. 3-4)  Defendants also

note that they included in their Answer "three affirmative defenses indicating that

Defendants should prevail on the three <u>Burlington/Carter</u> prongs."  (<u>Id.</u> at 4 (citing

Answer, ¶¶ 54-56))  Finally, Defendants point out that Fed. R. Civ. P. 8(c)(2) provides

that "[i]f a party mistakenly designates a defense as a counterclaim, or a counterclaim as

a defense, the court must, if justice requires, treat the pleading as though it were correctly

designated."  Fed. R. Civ. P. 8(c)(2).

This Court concludes that Plaintiffs were on notice that the Defendants

challenged the SRO's findings concerning the <u>Burlington</u> factors, and that it is

appropriate – for the reasons stated by Defendants – to review those findings now,

subject to the deferential standard of review discussed below.

### B.    <u>Standard of Review</u>

"[T]he role of the federal courts in reviewing state educational decisions

under the IDEA is circumscribed."  <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d

105, 112 (2d Cir. 2007) (internal quotation marks omitted).  While courts must "engage

in an independent review of the administrative record and make a determination based on

a 'preponderance of the evidence'" standard, <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 489 F.3d

105, 113 (2d Cir. 2007) (internal citations omitted), they may not "substitute their own

notions of sound educational policy for those of the school authorities which they

review.'"  <u>Id.</u>  Instead, reviewing courts must give "'due weight' to the administrative

---

[11]   Only a "party aggrieved by the findings and decision" of an SRO may bring a federal
or state court action, of course.  20 U.S.C. § 1415(i)(2)(A); <u>see also</u> <u>McAdams v. Bd. of
Educ.</u>, 216 F. Supp. 2d 86, 93-94 (E.D.N.Y. 2002) ("It is well settled that only a party
aggrieved by the findings and decision of the SRO may commence an action in federal
court.")  Here, Defendants were not aggrieved parties, because the SRO denied Plaintiffs'
sole claim for relief.

proceedings, mindful that the judiciary generally lacks the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational policy."

T.P. ex rel. S.P., 554 F.3d at 252 (quoting Gagliardo, 489 F.3d at 113 (quoting Bd. of

Educ. v. Rowley, 458 U.S. 176, 206 (1982)).  "Deference to the decision in the

administrative record is particularly appropriate when the administrative officers' review

has been thorough and careful, and when the Court's decision is based solely on the

administrative record."  S.W., 646 F. Supp. 2d at 352 (citing Walczak, 142 F.3d at 129;

Frank G., 459 F.3d at 367).  A reviewing court should also "accord the deference   . . .

traditional on appellate review" to the state hearing officer's assessment of witness

credibility.  J.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F. Supp. 2d 386, 399

(S.D.N.Y. 2004).

> ## C.    **Consideration of the Burlington Factors**
>
> ### 1.    **D.A. Was Denied a FAPE**

The IHO and SRO concluded that Defendants never offered an interim or

permanent placement to D.A. for the 2007-08 school year, and thus failed to offer D.A. a

FAPE as required by IDEA.  (IHO Dec. 24; SRO Dec. 7)  This Court finds no error in

this determination.

Defendants do not and cannot credibly argue that the CSE offered a

placement to D.A. at the August 10, 2007 CSE meeting.  It is undisputed that no

placement of any sort was offered at this meeting, and that the placement decision was

deferred to the CBST – even though the school year was about to begin.  Although

Defendants argue that the school psychologist/private school funding coordinator Linda

Lope testified that she discussed the AMAC school with the parents at the CSE meeting,

Lope never testified that the parents were offered a placement.  In any event, Lope's testimony concerning the AMAC school was entirely contradictory.  She testified both that there was no discussion of the AMAC school – and that the CSE had no school "in mind" – and that the AMAC school was discussed at the CSE meeting.  The parents denied any discussion of the AMAC school at the CSE meeting.  Given Lope's contradictory testimony, the IHO's decision to credit the parents' testimony on this point was entirely reasonable.

There is likewise no evidence that Defendants offered the Plaintiffs a placement after the CSE meeting.  While a CBST case manager is responsible for contacting parents such as Plaintiffs who received no placement from the CSE, there is no credible evidence that the CBST ever contacted Plaintiffs.  Lope testified that she had seen a letter sent by the CBST to D.A.'s parents, but the letter was never produced by DOE.  Indeed, there is no evidence that anyone from DOE was in contact with the parents after the CSE meeting about a placement for D.A.  (Tr. 183)

Under these circumstances, this Court cannot find that Defendants made a FAPE available to D.A.  See 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A), (B) (referring to obligation to make a FAPE "available" to children with disabilities).  While IDEA's requirement that an IEP specify "the anticipated frequency, duration, and location of [the] services [a student will receive]," 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (emphasis added), does not necessarily mean that the school site must be identified at the CSE meeting at which the IEP is produced, see K.Y. ex rel. T.Y. v. New York City Dept. of Educ., 584 F.3d 412, 419 (2d Cir. 2009) (finding that "the requirement that an IEP specify a 'location' does not mean that the IEP must specify a specific school site"), Defendants'

failure to offer any placement to D.A. prior to the start of the school year constitutes a denial of FAPE.  See Bettinger v. New York City Dept. of Educ., 2007 U.S. Dist. LEXIS 86116, at *22 (S.D.N.Y. 2007) (referencing SRO's finding that "[the student's] IEP required placement in a non-public school, and when no such placement was identified or finalized by the City's staff, the services offered by the Board of Education were inadequate under the first [Burlington] prong."); 20 U.S.C. § 1412(a)(10(C)(ii) (authorizing tuition reimbursement where a school district has "not made a free appropriate public education available to the child in a timely manner prior to [private school] enrollment") (emphasis added); cf. N.R. v. Dept. of Educ., 2009 WL 874061, at *7 (S.D.N.Y. March 31, 2009) ("Defendants have not cited, and the Court is unaware of, any case in which equitable considerations favored a school district that failed to offer a disabled child a school placement prior to the commencement of the school year.")

Defendant's argument that "only parental intransigence prevented the student from attending the identified placement" (Def. Br. 13) was properly rejected by the IHO and SRO.  There is no evidence of parental intransigence here.  As a result of the CSE meeting and the referral to the CBST, D.A.'s parents were contacted by three private schools:  Hawthorne, Greenberg, and AMAC.  It is undisputed that Mr. A and D.A. visited Hawthorne and Greenberg, but neither school offered a placement to D.A. (Tr. 177-81)  As to AMAC, Mr. A testified that after receiving a call from that school, he twice made return calls.  (Tr. 336, 188, 181-82)  Mr. A left a message stating that he was calling about a possible placement, but was never contacted again by AMAC, by telephone, email, or letter.  (Tr. 182)  While the Executive Director of the AMAC school testified that Plaintiffs never returned her calls, the IHO was free to accept Mr. A's

testimony over that of the Executive Director.  Given that Mr. A and D.A. visited two

other schools which had contacted Plaintiffs as a result of action taken by the CBST,

there is no basis on which to find that Plaintiffs rejected possible placements out-of-hand.

      In sum, Defendants' failure to offer a placement to D.A. cannot fairly be

attributed to "parental intransigence."  The IHO and SRO committed no error in

determining that Defendants had failed to offer an appropriate placement to Plaintiffs in a

timely manner, and thereby denied D.A. a FAPE.

      **2.**      **<u>The Rebecca School Was An Appropriate Placement for D.A.</u>**

      Plaintiffs bear the burden of demonstrating that the Rebecca School was

an appropriate placement for D.A.  <u>Frank G.</u>, 459 F.3d at 364.  Although a unilateral

parental placement need not satisfy IDEA's definition of a FAPE, <u>see id.</u>, and need not

meet state education standards or requirements, <u>see</u> <u>Florence County Sch. Dist. Four v.

Carter</u>, 510 U.S. 7, 14 (1993), "the same considerations and criteria that apply in

determining whether the School District's placement is appropriate should be considered

in determining the appropriateness of the parents' placement."  <u>Frank G.</u>, 459 F.3d at

364.  In short, "the issue turns on whether a placement – public or private – is 'reasonably

calculated to enable the child to receive educational benefits.'"  <u>Id.</u> (quoting <u>Rowley</u>, 458

U.S. 176, 207 (1982)).

      In making that determination, "[a] student's academic progress in a

unilateral private placement is relevant, but not dispositive."  <u>Stevens v. New York City

Dept. of Educ.</u>, 2010 U.S. Dist. LEXIS 25427, at *25 (S.D.N.Y. Mar. 18, 2010).  Instead

of relying solely on data reflecting academic progress, "courts . . . consider the totality of

the circumstances in determining whether that placement reasonably serves a child's

individual needs." Frank G., 459 F.3d at 364.  The parents must present evidence

demonstrating that their chosen placement is "'likely to produce progress, not

regression.'" Gagliardo, 489 F.3d at 112 (quoting Walczak, 142 F.3d at 130).  The

parents' choice "should [] be evaluated [by] looking at the program at the time that the

parents selected it," C.R. ex rel. W.B., 2005 U.S. Dist. LEXIS 15215, at *59 (E.D.N.Y.

June 10, 2005), rather than by considering the student's actual progress in the placement.

        Here, Defendants contend that the Rebecca School was not an appropriate

placement, because D.A. "had shown little progress during his previous year [there]," and

the school was not "specially designed to meet D.A.'s unique needs."  (Def. Sum. J. Br.

15)  Noting that "the school district [had] offered no witnesses or documentary evidence

which supported [its] position," the IHO concluded that the Rebecca School was an

appropriate placement.  The IHO relied on evidence demonstrating that D.A. had made

"substantial progress . . . both academically and socially," and that "the program at the

Rebecca School is aligned with the child's sensory processing, attentional, behavioral,

academic, language and communication, social, and motor needs . . . and has provided

the student with educational benefits."  (IHO Dec. 25)  The SRO "agree[d] with the

impartial hearing officer's finding that the Rebecca School was an appropriate

placement."  (SRO Dec. 7)

        In reviewing these administrative determinations, this Court has taken note

of the Second Circuit's repeated admonition that

        "[a]n assessment of educational progress is a type of judgment for which
        the district court should defer to the SRO's educational experience,
        particularly where . . . the district court's decision [is] based solely on the
        record that was before the SRO."

Frank G., 459 F.3d at 367 (quoting M.S., 231 F.3d at 105).

This Court agrees with the IHO and SRO that the parents presented sufficient evidence to demonstrate that the Rebecca School was an appropriate placement for D.A.  The Rebecca School provided D.A. with essentially all the services that the CSE had recommended in its IEP, with two exceptions:  (1) it offered D.A. one session per week of occupational therapy rather than two; and (2) rather than placing D.A. in a classroom with a consistent 6:1:1 student-teacher-paraprofessional ratio, it placed him in an 8:1:3 classroom for the first half of the year and a 4:1:2 classroom for the second half.  The Rebecca School also offered D.A. certain services that were not required by the IEP, such as art therapy and academic units specifically tailored to his interest in filmmaking.  Given these facts, the IHO and SRO did not err in concluding that the Rebecca School's program for D.A. was reasonably calculated to enable D.A. to receive educational benefits.

Moreover, the Woodcock-Johnson test administered to D.A. in May 2007 showed that he had made academic progress at the Rebeccca School over the past year.  While Lope emphasized a modest decline in reading comprehension, the test showed substantial gains in three other literacy skill areas.  Moreover, although Lope testified that D.A. had made "minimal progress" during his year at the Rebecca School, she conceded that D.A. had "made the expected academic improvement" for a student entering the Rebecca School with D.A.'s low test scores.  (Tr. 36)

Finally, Rebecca School staff members, and D.A.'s mother, offered detailed and consistent testimony concerning D.A.'s progress at that school, including substantial gains in social/emotional functioning, reflected in greater self-control, less anger, aggression and volatility, and more successful peer relationships.  D.A. gained the

ability to carry on a conversation, read and conduct research, care for himself, and travel unescorted back and forth from school.  (Tr. 321-22)

Because the Rebecca School offered a program substantially similar to that set forth in D.A.'s IEP, and because the record demonstrates that D.A. had made progress at the Rebecca School during the 2006-07 school year, the IHO's and SRO's finding that the Rebecca School was an appropriate placement for D.A will not be disturbed.

### 3.     The Equities Favor Funding D.A.'s Tuition

Funding of private school tuition may be denied where parents have failed to cooperate with a school district or otherwise frustrated a district's attempt to offer a FAPE.  See Forest Grove, 129 S.Ct. at 2496 ("courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant"); 20 U.S.C. § 1412(a)(10)(C) (tuition reimbursement may be denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents").  Here, the IHO determined that "[t]he record is clear that the parents cooperated in good faith at all times with the DOE" (IHO Dec. 27), and the SRO "agree[d] with the impartial hearing officer's findings that the parents cooperated with the district, participated at the CSE meeting, visited proposed placements, and notified the district in writing that they were re-enrolling the student at the Rebecca School when no placement was offered by the district."  (SRO Dec. 7)  The Court finds no error in these determinations.

Defendants argue that the IHO and SRO overlooked the parents' alleged non-cooperation with the DOE's placement procedures.  As discussed above, however, there is no credible evidence that the parents failed to cooperate with DOE.  Plaintiffs

fully participated in the August 2007 CSE meeting, visited two schools that contacted

them about a possible placement, and notified the district in writing of their decision – in

late August and in the absence of any placement from Defendants  – to re-enroll D.A. at

the Rebecca School.  As discussed above in connection with the first prong of the

Burlington test, the failure of Defendants to offer a FAPE to D.A. resulted not from a

parental lack of cooperation but from Defendants' abandonment of their responsibilities

to offer D.A. a placement prior to the start of the school year.[12]  Accordingly, the equities

here favor a grant of tuition funding, and the parents have carried the burden as to each of

the Burlington factors.

III.   **SECTION 1415(i)(2)(C)(iii) OF IDEA AUTHORIZES COURTS TO ORDER RETROACTIVE DIRECT PAYMENT OF PRIVATE SCHOOL TUITION WHERE A SCHOOL DISTRICT HAS DENIED A FAPE TO A CHILD ENTITLED TO SPECIAL EDUCATION SERVICES**

A.   **Standard of Review**

The SRO's ruling that IDEA does not authorize payment of private school

tuition costs where a parent – due to a lack of financial resources – has not incurred out-

of-pocket expense (SRO Dec. 8) presents a question of law subject to de novo review.

The SRO's decision on this point is entitled to no deference from this Court.  Arlington

---

[12]  Bettinger v. New York City Dept. of Educ., 2007 U.S. Dist. LEXIS 86116, at *22
(S.D.N.Y. 2007), cited by Defendants (Def. Sum. J. Br. 19-20), is easily distinguished.
In that case, the child's kindergarten placement was referred to the CBST at a CSE/IEP
meeting in June.  Id. at *6-7.  The parents were then contacted by the CBST and by two
private schools.  The parents refused to visit either school, because they felt that their son
should remain at the school he was then attending.  Id. at *9.  The IHO, SRO, and district
court all agreed that the parents had not cooperated with the DOE, and they were denied
tuition reimbursement on that basis.  Here, the CSE/IEP meeting was not conducted until
mid-August; Plaintiffs received no placement at that time; D.A.'s case was referred to the
CBST, but the CBST never contacted D.A.'s parents; and the parents nonetheless visited
two potential placements that contacted the parents at the volition of the CBST, but D.A.
was not admitted to either school.

Cent. Sch. Dist. v. L.P., 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006) ("[a] court accords no particular deference to an SRO on pure questions of law"); see also Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 408 (S.D.N.Y. 2005) ("[A]n SRO's determination of a pure question of law is not subject to deference"); Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (no deference is to be accorded a hearing officer's conclusion where that conclusion "raises an issue of statutory construction, a pure question of law that courts review de novo").

**B.     Scope of the Remedy Under Section 1415 of IDEA**

**1.     Statutory Language**

Section 1415 of IDEA authorizes a reviewing court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  In considering whether the private school tuition remedy under § 1415(i)(2)(C)(iii) is limited only to those parents who can afford to pay the cost of private school tuition in the first instance, it is worth recalling that numerous provisions of IDEA demonstrate special Congressional solicitude for the educational needs of disabled children from low-income families.[13]

IDEA was prompted by Congress's recognition that "there is an urgent and substantial need . . . to enhance the capacity of State and local agencies and service

---

[13]  These provisions are relevant to the issue before this Court because "a proper interpretation of [IDEA] requires a consideration of the entire statutory scheme." Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 522 (2007) (finding that parents are real parties in interest under IDEA while acknowledging that the parents "cannot cite a specific provision in IDEA mandating in direct and explicit terms that parents have the status of real parties in interest"); see also Cedar Rapids Cmty. Sch. Dist. v. Garrett F., 526 U.S. 66, 73 (1999) (considering IDEA's "overall statutory scheme" in concluding that one-on-one nursing services throughout the school day are among the services for handicapped children that the Act may require).

providers to identify, evaluate, and meet the needs of all children [with disabilities],

particularly minority, low-income, inner city, and rural children."  20 U.S.C. §

1431(a)(5).  This finding animates IDEA's requirement that special education services

are to be provided "at no cost to parents," id. at § 1401(29), and numerous provisions of

IDEA reflect Congress's determination that the guarantee of a FAPE should extend to all

children with disabilities, regardless of their financial means.  See, e.g., § 1437(b)(7)

(requiring that when any state seeks federal grant money for its early childhood

intervention programs, its application "shall provide satisfactory assurance that policies

and procedures have been adopted to ensure meaningful involvement of underserved

groups, including . . . low-income . . . families"); § 1453(b)(8) (requiring states seeking

grants for educational personnel development to "describe the steps that the State

educational agency will take to ensure that poor . . . children are not taught at higher rates

by teachers who are not highly qualified"); § 1471 (a)(2)(iii) (providing for federal grants

to nonprofit parent organizations only when "the parent and professional members of

which are broadly representative of the population to be served, including low-income

parents"); § 1481(d)(3)(C) (providing that in awarding general educational grants, the

Secretary may "give priority to . . . projects that address the needs of . . . children from

low income families").

        The legislative history of IDEA and its reauthorizations also reflects

Congress's concern with protecting the rights of low-income children and ensuring

universal access to special education services.  See, e.g., 136 Cong. Rec. S14410-02

(daily ed. Oct. 2, 1990) (statement of Sen. Kennedy) (expressing concern over the

"already pervasive condition" of "mislabeling and over-referral of minority, poor, and

limited-English proficient children"); 136 Cong. Rec. H9632-01 (daily ed. Oct. 15, 1990)

(statement of Rep. Miller) ("The legislation before us today clarified ambiguities in

current law to ensure that all children who need special services are not excluded because

of definitional barriers."); 150 Cong. Rec. S11658-01 (daily ed. Nov. 19, 2004)

(statement of Sen. Bingaman) (noting that IDEA was intended to address the fact that

"[t]he likelihood of exclusion was significantly greater for children with disabilities

living in low-income, ethnic and racial minority, or rural communities").

      The theme of concern for children from low-income families that runs

through IDEA and its legislative history counsels caution in adopting an interpretation of

§ 1415(i)(2)(C)(iii) that would limit a private school tuition remedy to those who have the

means to pay the tuition in the first instance.

### 2.     <u>Supreme Court Jurisprudence</u>

      Any discussion of judicial interpretation of the scope of remedial power

set forth in § 1415(i)(2)(C)(iii) must begin with <u>Burlington</u>.

      In <u>Burlington</u>, the Supreme Court considered whether the "grant of

authority" in §1415(i)(2)(C)(iii)

> includes the power to order school authorities to reimburse parents for
> their expenditures on private special education for a child if the court
> ultimately determines that such placement, rather than a proposed IEP, is
> proper under the Act.

<u>Burlington</u>, 471 U.S. at 369.  At that time, IDEA contained no language explicitly

authorizing a tuition reimbursement remedy.  The Court nonetheless had little difficulty

in unanimously holding that IDEA authorized such relief:

> We conclude that the Act authorizes such reimbursement.  The statute
> directs the court to "grant such relief as [it] determines is appropriate."
> The ordinary meaning of these words confers broad discretion on the

> court.  The type of relief is not further specified, except that it must be
> "appropriate" in light of the purpose of the Act.  As already noted, this is
> principally to provide handicapped children with "a free appropriate
> public education which emphasizes special education and related services
> designed to meet their unique needs."  The Act contemplates that such
> education will be provided where possible in regular public schools, with
> the child participating as much as possible in the same activities as
> nonhandicapped children, but the Act also provides for placement in
> private schools at public expense where this is not possible.  In a case
> where a court determines that a private placement desired by the parents
> was proper under the Act and that an IEP calling for placement in a public
> school was inappropriate, it seems clear beyond cavil that "appropriate"
> relief would include a prospective injunction directing the school officials
> to develop and implement at public expense an IEP placing the child in
> private school.

Id. at 369-70 (citations omitted).  The Court thus viewed it as self-evident that

prospective direct payment relief – i.e., an order directing a school district to pay a

private school the cost of educating a child with disabilities who could not properly be

educated in public school – was available under IDEA.

The Court then acknowledged the practical difficulties involved in parents

obtaining such relief prospectively, and concluded that a tuition reimbursement remedy

had to be made available in order to vindicate "the child's right to a free appropriate

public education":

> If the administrative and judicial review under the Act could be completed
> in a matter of weeks, rather than years, it would be difficult to imagine a
> case in which such prospective relief would not be sufficient.  As this case
> so vividly demonstrates, however, the review process is ponderous.  A
> final judicial decision on the merits of an IEP will in most instances come
> a year or more after the school term covered by that IEP has passed.  In
> the meantime, the parents who disagree with the proposed IEP are faced
> with a choice:  go along with the IEP to the detriment of their child if it
> turns out to be inappropriate or pay for what they consider to be the
> appropriate placement.  If they choose the latter course, which
> conscientious parents who have adequate means and who are reasonably
> confident of their assessment normally would, it would be an empty
> victory to have a court tell them several years later that they were right but
> that these expenditures could not in a proper case be reimbursed by the

> school officials.  If that were the case, the child's right to a <u>free</u> appropriate public education . . . would be less than complete.  Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

<u>Id</u>. at 370 (emphasis in original).  In finding that Section 1415(i)(2)(C)(iii) authorizes a reimbursement remedy, the Court noted that this remedy "merely requires the Town to belatedly pay expenses it should have paid all along and would have borne in the first instance had it developed a proper IEP."  <u>Id.</u> at 370-71.

<u>Burlington</u> is instructive here in several respects.  As an initial matter, it is apparent that the Court – although speaking in <u>dicta</u> – believed that the sort of direct payment to a private school sought by Plaintiffs here is available relief under the Act.  Second, the decision indicates that the term "appropriate" relief should be given its "ordinary meaning," and that courts enjoy "broad discretion" in determining "appropriate" relief.  Finally, the failure of the Act to make explicit mention of a particular remedy does not mean that the remedy is not, "in a proper case," "appropriate" relief.

In the years since <u>Burlington</u>, the Supreme Court has repeatedly rejected invitations to restrict the scope of remedial authority provided in Section 1415(i)(2)(C)(iii) and IDEA's universal guarantee of a FAPE to all disabled children.  In <u>Florence County School Dist. Four v. Carter</u>, 510 U.S. 7 (1993), for example, the Court rejected an argument that parents were barred from receiving tuition reimbursement where they enrolled their child – who had received an inadequate IEP and thus been denied a FAPE – in a private school that was not approved by the State and did not comply with certain of IDEA's requirements, including that special education services be

provided "under public supervision and direction."  The Court concluded that reading

such "requirements as applying to parental placements would effectively eliminate the

right of unilateral withdrawal recognized in Burlington" and would thereby defeat

IDEA's "statutory purpose" of "ensur[ing] that children with disabilities receive an

education that is both appropriate and free."  Carter, 510 U.S. at 13-14.

      Likewise, in Winkelman v. Parma City Sch. Dist., 550 U.S. 516 (2007),

the Court determined that IDEA's statutory scheme "accord[s] parents independent,

enforceable rights" which they may vindicate pro se if their children do not receive the

benefits IDEA assures them.  Id. at 526.  If that were not the case, the Court reasoned, a

parent would be able to bring suit in federal court "only under two circumstances:  when

the parent happens to have some claim related to the procedures employed; and when he

or she . . . has . . . a right to reimbursement."  Id. at 532-33.  The court "[found] nothing

in the statute to indicate that when Congress required States to provide adequate

instruction to a child 'at no cost to parents,' it intended that only some parents would be

able to enforce that mandate."  Id. at 533.  Rather, it found that parents as well as children

may enforce "the entitlement to a free appropriate public education for the parents'

child."  Id.

      Most recently, in Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484 (2009),

the Court rejected a school district's argument that § 1412(a)(10)(C)(ii) of IDEA was

intended to limit the scope of the remedy provided in Section 1415(i)(2)(C)(iii).  Section

1412(a)(10)(C)(ii) – part of amendments to IDEA enacted in 1997, after the Burlington

and Carter decisions, provides:

> If the parents of a child with a disability, who previously
> received special education and related services under the

> authority of a public agency, enroll the child in a private
> elementary school or secondary school without the consent
> of or referral by the public agency, a court or hearing
> officer may require the agency to reimburse the parents for
> the cost of that enrollment if the court or hearing officer
> finds that the agency had not made a free appropriate public
> education available to the child in a timely manner prior to
> that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii).

The school district argued that this provision forecloses a private school tuition reimbursement remedy where the child has not "'previously received special education and related services under the authority of a public agency.'"  Id. at 2493 (quoting 20 U.S.C. § 1412(a)(10)(C)(ii)).  The Supreme Court disagreed, finding that § 1412(a)(10(C)(ii) was not intended to limit the remedy provided in § 1415(i)(2)(C)(iii), but instead is "best read as elucidative rather than exhaustive."  Id. at 2493.  The Court determined that "Congress did not intend [§ 1412(a)(10)(C)(ii)] to supplant § 1415(i)(2)(C)(iii) as the sole authority on reimbursement awards but rather meant to augment the latter provision and our decisions construing it."  Id. at 2493, n.9.  The

> IDEA Amendments of 1997 did not modify the text of §1415(i)(2)(C)(iii)
> and we do not read § 1412(a)(10)(C) to alter that provision's meaning.
> Consistent with our decisions in Burlington and Carter, we conclude that
> IDEA authorizes reimbursement for the cost of private special-education
> services when a school district fails to provide a FAPE and the private-
> school placement is appropriate, regardless of whether the child previously
> received special education or related services through the public school.

Id. at 2496.

The Supreme Court's jurisprudence in this area reveals a consistent effort to read the remedial language of IDEA in a manner that is consistent with its statutory purpose of providing all disabled children with access to a FAPE.  Efforts to limit the broad discretionary language of § 1415(i)(2)(C)(iii) have proven unsuccessful.  While

the cases have focused on parents' right to private school tuition reimbursement where their child has been denied a FAPE – rather than prospective or retroactive direct payment relief – that fact reflects the practical realities and limitations of the administrative and judicial review process set forth in IDEA rather than a statutory limitation on the availability of prospective or retroactive direct payment relief.

### 3.     <u>Lower Court Authority</u>

While research has disclosed no federal decision holding that IDEA authorizes courts to order retroactive direct tuition payments to a private school under the circumstances here – where the parents incurred a debt for private school tuition and then chose to litigate whether their child had received a FAPE – courts have ordered prospective direct tuition payment in the context of the pendency or "stay put" provision of IDEA,[14] 20 U.S.C. § 1415(j), and in the context of compensatory education (remedying a prior denial of FAPE where a child has or will shortly age out of the Act).[15] In these decisions, courts have consistently refused to impose limitations on § 1415 relief that would favor wealthy parents over those of limited means, and have resisted a "price of admission" – or "front the funds" – approach to the assertion of rights under IDEA.

For example, in <u>Susquenita Sch. Dist. v. Raelee S.</u>, 96 F.3d 78 (3d Cir. 1996), the Third Circuit ruled that § 1415(i)(2)(C)(iii) empowers district courts to order

---

[14] "[D]uring the pendency of the due process review proceedings, parents are entitled to have the child 'stay put' in his or her 'current educational placement.'" <u>Board Educ. Pawling Cent. School Dist. v. Schutz</u>, 290 F.3d 476 (2d Cir. 2002). Accordingly, courts have "ordered . . . school district[s] to pay the costs  of . . . student[s'] tution during the pendency of administrative proceedings." <u>Murphy v. Arlington Cent. School</u>, 297 F.3d 195, 201 (2d Cir. 2002).

[15] The compensatory education remedy "is not expressly authorized by IDEA, but rather is a creature of case law.  The concept stems from the Supreme Court's decision in <u>Burlington</u>."  <u>Sabatini v. Corning-Painted Post Area School Dist.</u>, 78 F. Supp. 2d 138, 145 (W.D.N.Y. 1999).

prospective payment of private school tuition during the pendency of placement

litigation.  The court noted that if such payment were not an available remedy, "[f]amilies

without means will be hard pressed to pay for private education in what will almost

invariably be the significant time lapse between a ruling in their favor and the ultimate

close of litigation," id. at 87, and that "[t]he prospect of reimbursement at the end of the

litigation turnpike is of little consolation to those who cannot afford to pay the toll at the

outset."  Id. at 85.  The court further noted that

> [t]he purpose of the Act, which is to ensure that every child receives a
> "free and appropriate public education" is not advanced by requiring
> parents, who have succeeded in obtaining a ruling that a proposed IEP is
> inadequate, to front the funds for continued private education.

Susquenita, 96 F.3d at 86;[16] see also Lester H. v. Gilhool, 916 F.2d 865, 872-73 (3d Cir.

1990) (compensatory education claim; "we conclude that Congress, by allowing the

courts to fashion an appropriate remedy to cure the deprivation of a child's right to a free

appropriate public education, did not intend to offer a remedy only to those parents able

to afford an alternative private education.")

Similarly, in Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1286

(11th Cir. 2008), the Eleventh Circuit concluded that the district court was authorized

under § 1415 to award plaintiff placement in private school as compensatory education

for the school district's past failure to provide a FAPE.  The school district had argued

that while IDEA provided for private school tuition reimbursement, it did not provide for

an award of placement in a private school.  The Circuit rejected that argument:

---

[16]  The Third Circuit also commented that while "Burlington dealt with retroactive relief,
we do not believe that the Supreme Court's analysis should be confined to [that] . . .
context. . . . "  Susquenita, 96 F.3d at 85.

> We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement.  The Act does not relegate families who lack the resources to place their children unilaterally in private schools to shouldering the burden of proving that the public school cannot adequately educate a child before those parents can obtain a placement in a private school.  The Act instead empowers the district court to use broad discretion to fashion appropriate equitable relief.

Draper, 518 F.3d at 1286.

Likewise in Reid v. Dist. of Columbia, 401 F.3d 516, 522-23 (D.C. Cir. 2005), the D.C. Circuit upheld an award of compensatory education services to a child who had been denied a FAPE over many years.  Noting the availability of the tuition reimbursement remedy under Burlington, the court commented that if an award of compensatory education services was not an available remedy,

> children's access to appropriate education could depend on their parents' capacity to front its costs – a result manifestly incompatible with IDEA's purpose of "ensur[ing] that all children with disabilities have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A)

Reid, 401 F.3d at 523 (emphasis in original).

Finally, in Miener v. Missouri, 800 F.2d 749 (8th Cir. 1986), plaintiff sought to recover educational services for a three-year period in which she was denied a FAPE.  The child's father claimed that "he did not have the money to pay [for a proper placement]," and had been forced to place his daughter in an inappropriate facility.  Id. at 753.  The State argued that plaintiff's case should be dismissed, and that compensatory educational services "do not fit within the purview of Burlington because they do not constitute 'retroactive reimbursement.'"  Id. at 753.  The court flatly rejected that argument:

> We cannot agree with the defendants that they should escape liability for these services simply because Clyde Meiner was unable to provide them in the first instance; we believe that such a result would be consistent

38

> neither with <u>Burlington</u> nor with congressional intent.  Like the retroactive reimbursement in <u>Burlington</u>, imposing liability for compensatory educational services on the defendants "merely requires [them] to belatedly pay expenses that [they] should have paid all along."  105 S.Ct. at 2003.  Here, as in <u>Burlington</u>, recovery is necessary to secure the child's right to a free appropriate public education.  <u>Id</u>.  We are confident that Congress did not intend the child's entitlement to a <u>free</u> education to turn upon her parent's ability to "front" its costs.

<u>Id</u>. (emphasis in original).

Within this Circuit, a number of courts have stated or suggested in <u>dicta</u> that a direct tuition remedy is available where parents have presented a meritorious <u>Burlington</u> claim but lack the financial means to pay private school tuition out-of-pocket. For example, in <u>Connors v. Mills</u>, 34 F. Supp. 2d 795 (N.D.N.Y. 1998), plaintiff sought prospective payment of tuition costs at a non-approved private school, where the school district had conceded that it could not provide a FAPE to her child.  <u>Connors</u>, 34 F. Supp. 2d at 797, 799.  The school district contended that IDEA does not authorize prospective direct payment of private school tuition, and that plaintiff was required "to front the costs of unilateral placement and thereafter to request due process review in order to obtain reimbursement for same."  <u>Id</u>. at 800.  The court concluded that the school district could be required, under § 1415, "to pay the tuition directly" to the private school:

> once the <u>Burlington</u> prerequisites relative to a non-approved private school are met, and a parent shows that his or her financial circumstances eliminate the opportunity for unilateral placement in the non-approved school, the public school must pay the cost of private placement immediately.

<u>Id</u>. at 805-06.

The court reasoned that a contrary rule would leave parents of modest means with no options, while wealthier families pursued a reimbursement remedy:

By prohibiting prospective placement, Defendants would deny assistance to families that are not able to front the cost of a private, non-approved school, without exception.  Under Defendant's reading of the IDEA, therefore, even in a situation as the one presented here where both the school and the parent agree that the child's unique needs require placement in a private non-approved school and that there are no approved schools that would be appropriate, a destitute child would be left in an inappropriate program because the parents would not be able to front the tuition of the private placement.  Given the fragile state of many disabled children, and their dire need for constant and consistent care, even brief periods of inappropriate schooling could lead to tremendous educational, social, emotional, and psychological deterioration.  Families of greater economic means would not be faced with such a grim prospect.  It simply cannot be the case that an act designed to grant "all" disabled children access to needed services would undermine that very goal by making such access dependent upon a family's financial situation.

Id. at 805.[17]

Similarly, in S.W. v. New York City Dept. of Educ., 646 F. Supp. 2d 346

(S.D.N.Y. 2009), the court considered a claim for retroactive direct tuition payment

where the school district had denied a child a FAPE.  The court noted that

[t]he parties have cited no case in which a court has ordered direct tuition payment to a private school on a retrospective basis.  In a case where the equities favor such an award, there may be good reasons why direct tuition payment should be a remedy available to a needy parent, on either a prospective or retrospective basis.

S.W., 646 F. Supp. 2d at 360.[18]

The consistent message of the lower court decisions is that a child's access

to a FAPE cannot be made to depend on his or her family's financial ability to "front" the

costs of private school tuition.[19]

---

[17]  The court went on to deny relief to plaintiff, because she had "not even alleged that she is unable to front the cost of [the private school]."  Id. at 806.

[18]  The court went on to conclude that no such award was appropriate in that case, however, because the parent had not given the school district notice of her intention to enroll the child in private school.  Accordingly, the equities did not favor an award to plaintiff.  Id. at 360-64.

C.    <u>**Application of the Law**</u>

This Court concludes that where, as here, parents have satisfied each of the <u>Burlington</u> factors, this Court's "broad discretion" to "grant such relief as . . . is appropriate" under § 1415(i)(2)(C)(iii) includes the power, in a proper case, to award retroactive direct payment of private school tuition.  This conclusion flows directly from the language of this provision, which – as the Supreme Court stated in <u>Burlington</u>, and reiterated in <u>Forest Grove</u> – means what it says.

Under <u>Burlington</u>, a district court may (1) impose "a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school," <u>Burlington</u>, 471 U.S. at 369; and (2) require retroactive reimbursement for private school placement.  Given the well established nature of these remedies and the breadth of the language used in § 1415(i)(2)(C)(iii), there is no basis for this Court to conclude that the retroactive direct tuition payment relief sought by Plaintiffs here is unavailable.  It is entirely counter-intuitive to argue, as do Defendants here, that a court may, under § 1415(i)(2)(C)(iii), require a school district to pay a private school directly and prospectively for special education, may require the district to retroactively reimburse parents for private school tuition previously paid, but may not order a school district to pay the private school directly and retroactively for expenses already incurred.  Defendants offer no authority that supports such a result.

---

[19]   Courts considering claims under §1415(i)(2)(C)(iii) and its analogues have likewise not regarded out-of-pocket expense as a <u>sine qua non</u> for an award.  <u>See</u>, <u>e.g.</u>, <u>Bucks County Dept. of Mental Health v. Pennsylvania</u>, 379 F.3d 61 (3d Cir. 2004) (under early intervention analogue to § 1415, awarding mother of disabled daughter  reimbursement for her time spent providing therapy to her daughter where school district had refused to provide such services); <u>Hurry v. Jones</u>, 734 F.2d 879 (1st Cir. 1984) (awarding reimbursement to parents for time spent providing transportation to child's school).

The fact that IDEA does not explicitly reference this remedy is not dispositive.  Tuition reimbursement was not mentioned in IDEA when the <u>Burlington</u> court issued its ruling, yet the Supreme Court had no difficulty in finding that IDEA provides a reimbursement remedy.

Section 1415(i)(2)(C)(iii) authorizes a direct retroactive tuition remedy for the same reasons that the <u>Burlington</u> court found that the Act authorizes a tuition reimbursement remedy.  Given the nature of the administrative and judicial review process, parents who request an impartial hearing will rarely, if ever, be able to obtain a ruling prior to the onset of the school year.  Accordingly, denying parents the opportunity to seek retroactive relief is tantamount to denying them any relief at all under the Act.  Where parents have the financial resources to enroll their child in an appropriate private school, they may do so and seek retroactive reimbursement in a due process hearing.  Where, as here, parents lack the financial resources to "front" the costs of private school tuition, and in the rare instance where a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs – or will take years to do so – parents who satisfy the <u>Burlington</u> factors have a right to retroactive direct tuition payment relief.

A contrary ruling would be entirely inconsistent with IDEA's statutory purpose, including the goal of ensuring a FAPE to the least privileged of the disabled children in our nation.  Such a ruling would also be irreconcilable with decades of case law, summarized above, holding that the exercise of rights under IDEA cannot be made to depend on the financial means of a disabled child's parents.  Limiting "the right of unilateral withdrawal," <u>Carter</u>, 510 U.S. at 13, only to those with the financial means to

pay the costs of private school tuition in the first instance, is entirely antithetical to IDEA's universal guarantee of a "free, appropriate public education" to all children with disabilities, regardless of means. Defendants' arguments to the contrary are not persuasive.

Defendants first contend (Def. Opp. Br. 13-14) that Plaintiffs' claim should be denied because IDEA does not explicitly authorize direct payment of tuition costs to a private school. As an initial matter, and as discussed above, IDEA's failure to explicitly reference a particular remedy does not mean that courts lack the authority to grant that remedy under 1415(i)(2)(C)(iii). Burlington, 471 U.S. at 369-70 Defendants' related argument that Congress's 1997 amendments to IDEA – which reference reimbursement but not direct payment of tuition costs – were intended to bar any remedy other than reimbursement, is foreclosed by the Supreme Court's decision in Forest Grove.

As discussed above (see pp. 34-35, supra), in Forest Grove, 129 S. Ct. 2484, the school district argued that § 1412(a)(10)(C)(ii) of IDEA – which addresses tuition reimbursement where a child has received special education services in public school – was intended to limit the reimbursement remedy under § 1415(i)(2)(C)(iii) only to such children. The Supreme Court rejected that argument, holding that § 1412(a)(10(C)(ii) was not intended to limit the remedy provided in § 1415, and was "elucidative rather than exhaustive." 129 S. Ct. at 2493.

In an argument nearly identical to that rejected in Forest Grove, Defendants contend (Def. Br. 21-22) that because § 1412(a)(10(C)(ii) refers only to "reimburse[ment]" and not to direct payment of tuition to a private school, the latter remedy is not available under § 1415(i)(2)(C)(iii). Defendants go on to argue "that

43

although 20 U.S.C. § 1415(i)(2)(C)(iii) states that the reviewing court may 'grant such relief as the court determines is appropriate," this provision should be viewed in light of the statute's explicit remedy of reimbursement – at the exclusion of direct tuition payment."  (Id. at 22)

This argument is foreclosed by Forest Grove.  The Supreme Court held that § 1412(a)(10(C)(ii) does not limit the remedies available under § 1415(i)(2)(C)(iii). Use of the term "reimburse" in the former provision does not establish that reimbursement is the only available remedy under the latter provision, nor does it establish that a direct tuition payment remedy is not authorized under § 1415(i)(2)(C)(iii).

Defendants also point to Diaz-Fonseca v. Puerto Rico, 451 F.3d 13 (1st Cir. 2006), in which the First Circuit stated that

> [u]nder normal IDEA principles, Diaz is . . . not entitled to be reimbursed for educational expenses that she has yet to pay.  She is entitled to no more than the sum of the educational expenses she has already paid.

451 F.3d at 32 (emphasis in original).

In that case, Diaz was seeking "prospective relief in the amount of future educational expenses until [her daughter] reaches maximum school age."  Id. Accordingly, the First Circuit's remarks about reimbursement were directed to Diaz's effort to obtain recovery for future school years.  The court correctly noted that IDEA's remedial provisions are designed to guarantee each child a FAPE, and not to provide parents with "'a tort-like mechanism for compensating personal injury.'"  Id. at 31.

Here, however, Plaintiffs do not seek a recovery for their anticipated expenditures in future school years, nor do they seek reimbursement of any sort.  Instead, they seek a retroactive direct tuition payment to a private school for costs associated with

the 2007-08 school year.  They seek an order requiring the school district "belatedly [to] pay expenses that it . . . [sh]ould have borne in the first instance."  Burlington, 471 U.S. at 370-71.  Diaz-Fonseca does not address the type of relief at issue in this case.

Defendants also contend that "there is no dispute that the student D.A. was accepted to the Rebecca School for the school year in question and attended throughout the school year . . . [so] there was no elimination of the opportunity for unilateral placement."  (Def. Opp. Br. 10)  This argument ignores IDEA's requirement that school districts provide each child with disabilities with a FAPE.  That obligation was not met here.  The fact that Plaintiffs convinced the Rebecca School to enroll D.A. in the absence of public funding does not alter that fact.

Finally, Defendants argue that important policy interests are served by their proposed limitation on IDEA's remedial provisions.  They argue that if Plaintiffs' arguments are accepted, parents and private schools will

> enter into . . . sham transaction[s] in which it is tacitly understood that, should funding from the public school district . . . not be granted, the parent will be relieved from payment.  In such . . . [sham] transaction[s], the parent has no incentive to agree to a reasonable tuition price, and the private school could inflate that price to an amount that is well above market rate.

(Def. Br. 23)

Hearing officers and reviewing courts, however, already possess ample authority to reject or reduce tuition funding or payment requests where there is collusion between parents and private schools.  See Carter, 510 U.S. at 16 ("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors. . . . Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."); Gagliardo, 489 F.3d at 112 ("the district court enjoys

45

broad discretion in considering equitable factors relevant to fashioning relief"); Holland v. District of Columbia, 71 F.3d 417, 425 (D.C. Cir. 1995) (remanding to district court for consideration of, inter alia, reasonableness of tuition for which parents sought reimbursement); M.H. v. New York City Dep't of Educ., 2010 U.S. Dist. LEXIS 45400, at *119 (S.D.N.Y. 2010) (considering reasonableness of tuition amount in decision to award reimbursement); Echenasy v. New York City Dep't of Educ., 604 F. Supp. 2d 639, 653 (S.D.N.Y. 2009) (same). Where there is evidence that a private school has artificially inflated its tuition, hearing officers and courts are required to take this into account in determining an appropriate tuition award, whether that award constitutes prospective relief, retroactive reimbursement, or retroactive direct payment of tuition.

Here, Defendants have not alleged bad faith on the part of either the parents or the Rebecca School. There has been no suggestion that the Rebecca School's standard tuition is less than the $84,900 that the parents agreed to pay. Nor have Defendants suggested that the tuition charged was unreasonable in light of the education and related services the School provided.

The lenient payment schedule the Rebecca School entered into with Plaintiffs does not require that their claim be rejected. The payment schedule reflects the fact that tuition expenses at the Rebecca School dwarf Plaintiffs' annual income. Even assuming arguendo that "the Rebecca School intended to rely on the DOE to provide tuition funding," as Defendants argue (Def. Br. 24), this does not change the nature of DOE's obligations to D.A. and his parents under IDEA. Presumably, nearly all parents who make a unilateral placement under IDEA and then seek tuition reimbursement act at least in part out of a hope, belief, or expectation that the school district will ultimately be

forced to fund their placement. The only difference in this case is that the Rebecca School absorbed some of that risk, by agreeing with a needy family to a permissive payment schedule. That agreement does not change the fact that Defendants denied D.A. a FAPE, that the Rebecca School was an appropriate placement, that the equities favor payment of tuition, and that § 1415(i)(2)(C)(iii) is sufficiently broad to encompass the retroactive direct tuition payment relief Plaintiffs seek.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment (Docket No. 31) is GRANTED, and Defendants' motion for summary judgment (Docket No. 27) is DENIED. The parties are directed to submit a proposed judgment to this Court by February 5, 2011.

Dated:      New York, New York
            February 1, 2011            SO ORDERED.

            Paul G. Gardephe
            United States District Judge